798 F.2d 679
 41 Fair Empl.Prac.Cas. 1650,
41 Empl. Prac. Dec. P 36,497, 5 Fed.R.Serv.3d 1223
 Marcus ARDREY, James Cherry, Bessie Easterling Brown, Louis
Funderburk, Horace Jenkins, Joyce Massey, Jerome Morrow,
Sr., Eugene Neal, Matthew Smith, Jr., Henry Tyson, Sr.,
Cheryl Pettigrew, Carl Watts, individually and on behalf of
all others similarly situated, Appellants,
v.
UNITED PARCEL SERVICE, a corporation, Appellee.
 No. 85-2239.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1986.
Decided Aug. 18, 1986.
 
 Michael A. Sheely, Charlotte, (Russell, Sheely & Hollingsworth on brief), for appellants.
 William W. Sturges (Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, P.A., Charlotte, N.C., on brief), for appellee.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 * Numerous plaintiffs employed by the West Carolina district of United Parcel Service ("UPS"), which encompasses the western part of North Carolina and all of South Carolina and is centered in Charlotte, North Carolina, by complaint dated May 20, 1982 moved for class certification, filed individual discrimination claims pursuant to 29 U.S.C. Sec. 621, Age Discrimination in Employment Act ("ADEA"), Sec. 1981 of the 1866 Civil Rights Act, and Title VII of the 1964 Civil Rights Act. The plaintiffs alleged class discrimination against them as a race. Specifically, they alleged that UPS had engaged in a "policy and practice whereby UPS deprives blacks of their rights to equal employment opportunities." On information and belief plaintiffs alleged four ways in which UPS's policy and practice operated, namely through 1) termination, discipline and suspension; 2) promotion; 3) transfer of employees from part-time to full-time positions; and 4) racist atmosphere.[1]
 
 
 2
 The instant appeal concerns the district court's handling of the discovery phase of the case. In their first set of interrogatories the named plaintiffs requested information related to their individual claims, as alleged in their complaint. UPS answered these interrogatories and provided information not only about the specific UPS employee in question, but also about others who had been promoted, transferred or qualified for various positions.[2] At the same time as they served their first set, plaintiffs served a second set of interrogatories seeking "class pattern/practice information" about the Charlotte, North Carolina headquarters of the UPS West Carolina region. Plaintiffs sought information about the employment history of all employees who had worked in the Charlotte headquarters since January 1, 1979, about all vacancies which occurred in all job titles since January 1, 1979, the name and race of each person who filled the vacancies and the date the vacancies occurred and were filled, about transfer and promotion system policies, and the names, race and job titles of persons with knowledge of various personnel practices, including hiring, promotion and transfer and the methods by which employees were disciplined and the ways employees were transferred from part-time to full-time positions. Plaintiffs also requested information about the number of whites and blacks who were promoted, transferred, employed, or qualified for full-time jobs.
 
 
 3
 In response to the second set of interrogatories, UPS filed many answers and documents, but objected to interrogatories seeking information about the employment history of employees, statistics, and duties, pay grades and minimum qualifications for jobs that were not related to the claims of individual plaintiffs.[3]
 
 
 4
 Before these two sets of interrogatories were served on defendant, UPS had moved for (and the district court had granted on October 22, 1982) a limitation on initial discovery which restricted plaintiffs to discovery about information related to their individual claims as opposed to information regarding their class action. In granting such a limitation, the court stated that "[o]nce such individual action or actions are established, the Court will consider requests for further discovery of a class-wide nature. The plaintiffs have failed to allege or show how they would be prejudiced by this bifurcated discovery process." The court noted it agreed with counsel for UPS that plaintiffs would be required "to establish viable individual actions" before class discovery would be allowed. The court relied on East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) and General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) in so deciding.[4]
 
 
 5
 Subsequent to UPS's refusal to answer various of their second set of interrogatories, plaintiffs filed motions to compel. On April 1, 1983, the court denied these motions on the ground that the information requested (e.g., name and race of all persons qualified to be package drivers, statistical information about promotions to other jobs, movement from part-time to other full-time jobs, which were not sought by plaintiffs), was "hardly germane to [the individual plaintiffs'] claims in view of the statistical data already furnished in respect to the specific jobs they sought." (Emphasis provided). The court reasoned that because UPS had already provided information about individuals and their claims pursuant to the first set of interrogatories, UPS was not required to produce the "comprehensive employment history" requested in the second set which was not relevant to individual claims. The court also noted such information would be inordinately burdensome for defendant to prepare.
 
 
 6
 Plaintiffs served defendant with a third set of interrogatories on April 6, 1983. UPS objected to providing disciplinary information about the number of blacks and whites who had received warnings, or who were suspended or disciplined, and limited its responses to the information about individual employees which it had already provided.[5] A third motion to compel ensued which the district court denied. The plaintiffs moved for reconsideration, on the grounds of our opinions in Lilly v. Harris-Teeter, 720 F.2d 326 (4th Cir.1983), cert. denied, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984), and Knighton v. The Laurens School District, 721 F.2d 976 (4th Cir.1983). The district court subsequently modified its order and compelled UPS to provide the names of those in the Charlotte office who made various employment decisions, pursuant to our decision in Lilly, 720 F.2d at 338, which held that where the "same ... managerial personnel were responsible for decision making" in several allegedly discriminatory contexts, a case of discriminatory intent might be made out. In other regards, the district court reaffirmed its earlier order.
 
 
 7
 The case was heard by the court without a jury and trial was limited to plaintiffs' individual claims. The district court found for UPS on all issues and dismissed plaintiffs' claims. 615 F.Supp. 1250. The court found no evidence that individual black plaintiffs had been discriminated against in regard to warnings, suspensions, terminations, promotions, or moves into full-time jobs, or had been treated in any way different from whites. After lengthy findings of fact, the court examined the relevant law as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which establishes a shifting burden for Title VII discrimination suits. The court examined the specific legal elements of the individual plaintiffs' claims and found that "Defendant offered substantial evidence that the alleged adverse employment actions concerning the Plaintiffs were based upon legitimate, nondiscriminatory business considerations." In addition, the court found that plaintiffs had not shown that the reasons offered by defendant to explain its employment actions were pretextual. The district court concluded that defendants had not discriminated against plaintiffs on account of race or sex in violation of Title VII or Sec. 1981. Because it only reached plaintiffs' individual allegations of discriminatory treatment, the court did not discuss plaintiffs' class-based pattern/practice claim, i.e., that UPS had a "policy and practice whereby [it] deprives blacks of their rights to equal employment opportunities."
 
 
 8
 The district court retained jurisdiction of the case as a possible class action for fourteen days in order to allow preparation by plaintiffs of a class certification motion. Because the parties did not submit a schedule for class certification, the court dismissed that portion of plaintiffs' case and entered judgment for the defendants on September 6, 1985.
 
 II
 
 9
 On appeal, plaintiffs contend that the district court's limitation of discovery to their individual discrimination claims thwarted their efforts to establish that UPS engaged in a "pattern and practice" of discrimination against blacks. Because "class-wide" discovery was not allowed, plaintiffs were unable to establish pattern and practice discrimination according to Teamsters v. United States, 431 U.S. 324, 331, 335-36, 97 S.Ct. 1843, 1852, 1854-55, 52 L.Ed.2d 396 (1977). Teamsters discrimination differs from a McDonnell Douglas/Burdine Title VII claim in that it allows a plaintiff, by preponderance of the evidence, to show that an employer had "a pattern or practice of employment discrimination" or that "disparate treatment" of black employees was the "company's standard operating procedure--the regular rather than the unusual practice." Teamsters, 431 U.S. at 336, 97 S.Ct. at 1854. For a Teamsters claim, the plaintiff, after establishing a prima facie case of discrimination, must then, by the preponderance of the evidence, establish that discrimination was the "standard operating procedure" of the defendant. Most often, the plaintiff establishes such a case by statistics, bolstered by other testimony. 431 U.S. at 336, 339, 97 S.Ct. at 1855-56.
 
 
 10
 Plaintiffs' argument is that they were prevented from obtaining the class-wide discovery related to other black and white employees of UPS which would allow them to establish through statistics that UPS had a "pattern or practice" or standard operating procedure of discrimination against blacks.
 
 III
 
 11
 We begin with the familiar principles that a district court has wide latitude in controlling discovery and that its rulings will not be overturned absent a showing of clear abuse of discretion. Rabb v. Amatex Corp., 769 F.2d 996, 999 (4th Cir.1985); Belcher v. Bassett Furniture Industries, Inc., 588 F.2d 904, 907 (4th Cir.1978); Ellis v. Brotherhood of Railway, Airline and Steamship Clerks, 685 F.2d 1065, 1071 (9th Cir.1982), aff'd in part and rev'd in part, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The latitude given the district court extends as well to the manner in which it orders the course and scope of discovery. Eggleston v. Chicago Journeymen Plumbers Etc., 657 F.2d 890, 902 (7th Cir.1981), cert. denied, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982); Sanders v. Shell Oil Co., 678 F.2d 614, 618 (5th Cir.1982). Although it is "unusual to find an abuse of discretion in discovery matters," Sanders, 678 F.2d at 618, a district court may not, through discovery restrictions, prevent a plaintiff from pursuing a theory or entire cause of action. Diaz v. American Tel. & Tel., 752 F.2d 1356, 1363 (9th Cir.1985); Trevino v. Celanese Corp., 701 F.2d 397 (5th Cir.1983).
 
 
 12
 To put plaintiffs' claims that they were improperly denied discovery into perspective, it is necessary to examine the two broad theories of Title VII cases--disparate treatment and disparate impact. At the outset, it is important to note that the two theories are not applied "with wooden inflexibility and in unvarying accordance with the details of their original formulations, nor in mutually exclusive fashion." Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 572 (4th Cir.1985). Nonetheless, the two theories are also not "simply interchangeable"--they indeed do "reflect critical substantive differences as to discrimination in the context of Title VII."
 
 
 13
 The first theory advanced by plaintiffs was that they were discriminated against by their employer because of their race, i.e., they were subject to "disparate treatment." Those claims require a determination of whether the individual plaintiffs were victims of racial discrimination. In order to show this, the plaintiffs at all times have the "ultimate burden of persuading the court that [they were] the victim[s] of intentional discrimination." Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. Whether plaintiffs have in fact shouldered the burden is subject to the "analytical framework" of McDonnell Douglas Corp. v. Green, supra, which is " 'intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination' in private, nonclass Title VII cases," Coates v. Johnson & Johnson, 756 F.2d 524, 541 (7th Cir.1985), citing Burdine, 450 U.S. at 255 n. 8, 101 S.Ct. at 1094 n. 8. The district court here applied the schema of Burdine and McDonnell Douglas and plaintiffs make no objection to the district court's finding that they did not surmount the hurdle of showing that the "legitimate, nondiscriminatory reason[s]" for UPS's treatment of the individual plaintiffs were pretextual. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Burdine, 450 U.S. at 254, 101 S.Ct. at 1094.
 
 
 14
 A second inquiry is necessary where plaintiffs, as here, advance a second theory--a claim that they were subject to disparate treatment in such a way as to make them proper representatives of a class subject to such treatment. The plaintiffs (if proper class representatives) must establish individual claims factually related to the alleged class claims, since a class-based disparate treatment suit proceeds on the theory that a company discriminates against its black employees by treating them differently than its white employees. In order to establish a disparate treatment claim, otherwise known as a "pattern and practice case," plaintiffs must " 'prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. [They need] to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure--the regular rather than the unusual practice.' " Teamsters, 431 U.S. at 336, 97 S.Ct. at 1855, quoted in Pouncy v. Prudential Ins. Co. of America, 668 F.2d 795, 802 (5th Cir.1982). Statistical evidence may be used in a disparate treatment case to show "both motive and a pattern or practice of racial discrimination. In a proper case, [the court] may infer racial discrimination if gross statistical disparities in the composition of an employer's work force can be shown." Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, quoted in Pouncy, 668 F.2d at 802. Once plaintiffs have established that unlawful discrimination has been the company's standard operating procedure by way of statistical evidence, the burden shifts to defendants to articulate a reason why such proof is "inaccurate" or "insignificant" or to show that they had a nondiscriminatory reason for the "apparently discriminatory result." Teamsters, 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46; Coates v. Johnson & Johnson, 756 F.2d at 532.
 
 
 15
 In summary, the "liability portion of a ... class disparate treatment case is essentially comparable to the framework outlined in McDonnell Douglas-Burdine for individual disparate treatment actions," but
 
 
 16
 [t]he focus in a class action is "on a pattern of discriminatory decision-making," of which specific allegations of alleged discrimination may be a part, although not always controlling if the number of such instances is not significant. The class action "may fail even though discrimination against one or two individuals has been proved." The pattern or practice claim may also fail--despite any statistical evidence offered by plaintiffs--if the defendant articulates a nondiscriminatory, nonpretextual reason for every discharge. On the other hand, the class claim does not fail just because the district court finds that the company has satisfactorily explained the discharges of the named class representatives and any other testifying employees. Since strong statistical evidence, without anecdotal evidence, may in some cases form a prima facie case, a defendant's successful rebuttal of each alleged instance of discrimination weakens, but does not defeat, a plaintiff's class claim. Neither statistical nor anecdotal evidence is automatically entitled to reverence to the exclusion of the other.
 
 
 17
 Coates v. Johnson & Johnson, 756 F.2d at 532-33 (citations omitted).
 
 
 18
 The scope of discovery in Title VII cases is geared to allowing plaintiffs to proceed under either a disparate treatment or pattern or practice theory or both. Generally, undue restrictions of discovery in Title VII cases are "especially frowned upon." Trevino, supra, 701 F.2d at 405. The restrictions placed on such discovery are dictated "only by relevance and burdensomeness." Rich v. Martin Marietta Corporation, 522 F.2d 333, 343 (10th Cir.1975).
 
 
 19
 In addition, "statistical evidence is unquestionably relevant in a Title VII disparate treatment case." Diaz, supra, 752 F.2d at 1362. Such evidence may help establish a prima facie case and is often crucial for the plaintiff's attempt to establish an inference of discrimination. Id. Such evidence may also aid the plaintiff in showing that a "defendant's articulated nondiscriminatory reason for the employment decision in question is pretextual." Id. at 1363. In a pattern and practice case, "[s]tatistical data is relevant because it can be used to establish a general discriminatory practice in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue. In some cases, statistical evidence alone may be sufficient to establish a prima facie case." Id.
 
 
 20
 The question here presented is whether the restrictions placed on discovery by the individual claimants prevented them from gathering evidence to show that there was such a "general discriminatory practice" on the part of UPS. Plaintiffs claim they were prevented from getting discovery of a "class-wide nature," i.e., discovery relating to their proposed class action. They were restricted to discovery on their individual claims and were not allowed to get discovery "regarding groups or classes of employees, unless such discovery would produce information relevant to the individual claims."
 
 
 21
 However, the district court did allow discovery as to information regarding others similarly situated to the individual plaintiffs. For example, UPS provided the name, race, prior job, hire date and date the individual became a driver for thirteen individuals who were part-time bargaining employees promoted to full-time package car driving positions from January 1, 1980 until December 31, 1981, in regard to Marcus Ardrey's claim; for James Cherry, UPS provided similar information as to the twenty-five persons who were part-time employees who were promoted to full-time package car drivers from January 1, 1978 until December 31, 1979 and for twenty-four who failed to qualify as package car drivers in the same period; for plaintiff Joyce Y. Massey, UPS provided similar information on those promoted to supervisory jobs since January 1, 1979.
 
 
 22
 Conversely, what UPS refused to provide was information about promotion to other positions, positions which plaintiffs did not seek, or concerning the employment histories of employees who held jobs which were not relevant to individual claims. The reason articulated by the district court for refusal to grant such discovery was that it would be burdensome. We are satisfied that the district court did not exceed its discretion in so restricting discovery. Plaintiffs' argument that the restrictions foreclosed their opportunity to develop a pattern and practice case is without merit. The discovery allowed as to their individual claims was sufficient to develop evidence, statistical and otherwise, relating to whether discrimination was the "standard operating procedure" of UPS in regard to their positions, or concerning promotions, transfers, suspensions or discipline, related to their individual claims.
 
 
 23
 Plaintiffs confuse their "class-based" claims--as potential representatives of a class of UPS employees--with their individual attempts to show a discriminatory pattern and practice by UPS. The district court has the responsibility of managing complex Title VII litigation under guidelines established by the Supreme Court. In East Texas Motor Freight v. Rodriguez, supra, the Court has held that district courts must pay close attention to certification of class representatives in a Title VII suit. In General Telephone Co. of Southwest v. Falcon, supra, the Court rejected the Fifth Circuit's "across the board" rule which permitted a class action representative to represent, on the basis of his or her discrimination claim, a class of persons who have no claim in common other than an allegation that a defendant company has a policy of discrimination. Falcon, 457 U.S. at 157, 102 S.Ct. at 2370. A proper class representative must "bridge the gap" between his individual claim and the allegation that the defendant has a general policy of discrimination against others of his or her race. The prospective representative must offer proof of
 
 
 24
 much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving whites were advanced may support the conclusion that respondent was denied the promotion because of his [race], such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of ethnic discrimination ..., or (3) that this policy of ethnic discrimination is reflected in petitioner's other employment practices....
 
 
 25
 Falcon, 457 U.S. at 158, 102 S.Ct. at 2371. A district court errs if it fails "to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)." Id. at 160, 102 S.Ct. at 2372. See also Lilly v. Harris-Teeter Supermarket, supra, 720 F.2d at 333; Holsey v. Armour & Co., 743 F.2d 199, 216 (4th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985).
 
 
 26
 The district court here correctly followed the dictate of Falcon to evaluate carefully the claims of the individual plaintiffs in a Title VII suit. We are not in a position to second-guess the district court's determination of such matters, given the complex task of managing the multifarious questions which arise in such litigation. While we do not hold that the procedure followed by the district court in allowing individual discovery, while delaying class-wide discovery, would invariably be proper or required under Falcon, it was no abuse of discretion here.
 
 
 27
 Given the wide discovery allowed on the individual plaintiff's claims, we hold that the district court did not abuse its discretion by foreclosing discovery on plaintiffs' pattern and practice claims. The district court found that no one of the individual plaintiffs had established a prima facie case of discrimination by UPS. For the foregoing reasons, the decision of the district court is
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 The various individual plaintiffs alleged the following specific discriminatory acts: (1) Marcus Ardrey --alleged he was prevented from moving from a part-time to a full-time position because of his race; (2) James Cherry --alleged he was denied a full-time position (he was employed half-time) and received unjustified warnings because of his race; (3) Bessie Easterling [Brown]--was denied days off, subjected to unwanted physical contact by junior white employees and subjected to harassment by white dispatchers because of her race; (4) Louis Funderburk --was treated differentially as a UPS driver because of his race; (5) Horace Jenkins --was denied "light duty" work and had duties taken away from him because of his race; (6) Joyce Massey --was discharged because of her race; (7) Jerome Morrow, Sr.--was denied promotion and required to work in a racist atmosphere because of his race; (8) Eugene Neal --was harassed and denied promotion because of his race; (9) Matthew Smith, Jr.--was given poor work runs, poorer equipment, and warning letters for infractions he did not commit because of his race; (10) Henry Tyson, Jr.--was subject to working in a racist atmosphere; (11) Carl Watts --was disciplined because of his race; (12) another plaintiff, who was allowed to intervene, Cheryl Pettigrew, alleged racial discrimination in her treatment by her supervisor, training and subsequent discharge
 
 
 [2]
 For example, for plaintiff Marcus Ardrey, UPS provided the "name, race, prior experience, prior education, qualifications, date of hire, date became full-time of each person who obtained a full-time package car driving position between January 1, 1980 and December 31, 1982"; for plaintiff James Cherry, UPS provided similar information on those part-time bargaining unit employees who were promoted to and qualified for full-time package car driving positions
 
 
 [3]
 For example, UPS refused to provide the number of whites and blacks in various broad categories of employment for 1979 to date because "such data would be irrelevant to plaintiff Pettigrew's claim" and objected "to providing information on the job duties and pay rates of management, supervisory and clerical jobs that are not involved in any of plaintiffs' individual claims."
 
 
 [4]
 The district court established a guideline "that discovery at this time will not be allowed as to other individuals who are not presently plaintiffs of record, or to statistical information regarding groups or classes of employees, unless such discovery would produce information relevant to the individual claims."
 
 
 [5]
 Defendant again noted that it objected "to furnishing the requested information for all employees in the requested job classifications ... since the information would not be relevant to the individual claims of any plaintiff and would be unduly burdensome to obtain."